1  Roland Tellis (SBN 186269)
2  rtellis@baronbudd.com
   Mark Pifko (SBN 228412)
3  mpifko@baronbudd.com
   Peter Klausner (SBN 271902)
4  pklausner@baronbudd.com
   BARON & BUDD, P.C.
5  15910 Ventura Boulevard, Suite 1600
   Encino, California  91436
6  Telephone:  (818) 839-2333
   Facsimile:  (818) 986-9698
7
8  *Additional counsel identified below*

9  Attorneys for Plaintiffs
10  DINA ANDREN, SIDNEY BLUDMAN,
   VIRGINIA CIOFFI, BERNARD FALK,
11  JEANETTE KERZNER-GREEN, CAROL
   MONTALBANO, and DONALD RIGOT,
12  individually, and on behalf of other members
   of the general public similarly situated
13
14
                UNITED STATES DISTRICT COURT
15              SOUTHERN DISTRICT OF CALIFORNIA
16

17  DINA ANDREN, SIDNEY BLUDMAN,          Case Number:  3:16-cv-01255-GPC-NLS
   VIRGINIA CIOFFI, BERNARD FALK,        **CLASS ACTION**
18  JEANETTE KERZNER-GREEN, CAROL
   MONTALBANO, and DONALD RIGOT,         **CORRECTED**
19  individually, and on behalf of other   **FIRST AMENDED COMPLAINT**
   members of the general public similarly
20  situated,                             **Jury Trial Demanded**
21
               Plaintiffs,
22
           vs.
23
24
   ALERE INC., a Delaware corporation,
25  ALERE HOME MONITORING, INC., a
   Delaware corporation, ALERE SAN
26  DIEGO, INC., a Delaware corporation,
27
               Defendants.
28

For their complaint against Defendants Alere, Inc., Alere Home Monitoring, Inc. and Alere San Diego, Inc., (hereinafter and collectively, "Defendants" or "Alere"), Plaintiffs Dina Andren, Sidney Bludman, Virginia Cioffi, Bernard Falk, Jeanette Kerzner-Green, Carol Montalbano, and Donald Rigot ("Plaintiffs"), individually, and on behalf of all other members of the general public similarly situated ("the Class"), based on information and belief, allege as follows:

## NATURE OF THE ACTION

1.      This action is brought on behalf of Plaintiffs and a class of consumers who purchased "INRatio PT/INR Monitors," "INRatio PT/INR Test Strips," "INRatio2 PT/INR Monitors" and "INRatio2 PT/INR Test Strips" (collectively, the "INRatio Products").  Plaintiffs' claims concern the unlawful, deceptive and misleading practices conducted by Defendants in connection with the manufacturing, marketing and sales of the INRatio Products in violation of California law and the common law.

2.      For patients taking blood-thinners, the ability to monitor and test their blood-clotting times and adjust their dosages accordingly is essential.  Failure to take the appropriate dosage of blood-thinners can result in serious bodily injuries and death. Defendants' INRatio Products are electronic testing devices designed (at least, in theory) to help patients who have been prescribed blood-thinners monitor their blood-clotting times, to ensure they are receiving the proper dosage.  The INRatio Products, however, are not exclusively prescription devices.  Prior to the July 2016 Class I recall of the INRatio Products (which occurred after this case was filed), consumers could, and in fact, did, purchase the INRatio Products without a prescription.[1]

3.      Unbeknownst to consumers, almost immediately after the INRatio Products became available for sale to the public, Defendants learned that the INRatio Products produced erroneous results.  Defendants received numerous complaints from users and

---

[1] According to the FDA's website, "[t]he FDA has identified this as a Class I recall, the most serious type of recall. Use of these devices may cause serious injuries or death."  See http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm518070.htm (last visited Oct. 3, 2016).

multiple warning letters from the FDA, notifying them that the results produced by the INRatio Products differed from those produced by independent laboratories. Nevertheless, Defendants withheld material information from the public and continued selling the INRatio Products unabated, marketing and advertising them as an INR monitor, which was "accurate," "convenient," "effective," "reliable," "optimal" and "safe." Contrary to Defendants' representations, the INRatio Products were not international normalized ratio monitors, nor were they "accurate," "convenient," "effective," "reliable," "optimal" or "safe."

4.     Believing that the results produced by a testing product like the INRatio Products are accurate, as any reasonable consumer would, consumers of the INRatio Products relied on the erroneous results produced by the INRatio Products and improperly adjusted their blood-thinner dosages, increasing the risk and likelihood of serious bodily injury or death.[2] No reasonable consumer would purchase a testing product whose results are unreliable, particularly when their health depends on it.

5.     Based on the Defendants' wanton disregard for the health and safety of their customers -- as shown by their willingness to manufacture, market, and sell a defective and life-threatening product to consumers in a deceptive, fraudulent and misleading manner -- Plaintiffs bring this action on behalf of themselves and on behalf of the Class.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants. Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

7.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the claims are

---

[2] To date, INRatio Products have been linked to at least three deaths.

derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

8.      Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d), because each of the Defendants transacted business in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims in this lawsuit occurred, among other places, in this District.

## **PARTIES**

9.      Plaintiff Dina Andren ("Plaintiff Andren") is an individual residing in Monroe, New York, and is a citizen of the State of New York.

10.     Plaintiff Sidney Bludman ("Plaintiff Bludman") is an individual residing in Chevy Chase, Maryland, and is a citizen of the State of Maryland.

11.     Plaintiff Virginia Cioffi ("Plaintiff Cioffi") is an individual residing in Vero Beach, Florida, and is a citizen of the State of Florida.

12.     Plaintiff Bernard Falk ("Plaintiff Falk") is an individual residing in Hummelstown, Pennsylvania, and is a citizen of the State of Pennsylvania.

13.     Plaintiff Jeanette Kerzner-Green ("Plaintiff Green") is an individual residing in Savannah, Georgia, and is a citizen of the State of Georgia.

14.     Plaintiff Carol Montalbano ("Plaintiff Montalbano") is an individual residing in North Babylon, New York, and is a citizen of the State of New York.

15.     Plaintiff Donald Rigot ("Plaintiff Rigot") is an individual residing in Denver, Colorado, and is a citizen of the State of Colorado.

16.     Defendant Alere, Inc. is a Delaware corporation authorized to do business in the State of California and nationwide.  Alere, Inc., independently and through its subsidiaries Defendant Alere Home Monitoring, Inc. and Defendant Alere San Diego, Inc., manufactures, markets and sells medical diagnostic testing products (including the INRatio Products) for professionals, patients and consumers around the country, including in California.  In 2014, Alere, Inc. generated over $1.2 billion in gross profits.

17.     Defendant Alere Home Monitoring, Inc. (hereinafter, "AHM") is a Delaware

3

corporation authorized to do business in the State of California and nationwide.  It is, and was at all relevant times a wholly owned and controlled subsidiary of Defendant Alere, Inc.  AHM assists patients, in California and nationwide, in acquiring the INRatio Products, and provides physicians with the necessary tools to allow them to integrate the patient self-testing undertaken with the INRatio Products into their practices.

18.     Defendant Alere San Diego, Inc. (hereinafter, "ASD") is a Delaware corporation authorized to do business in the State of California and nationwide.  It is a wholly owned and controlled subsidiary of Defendant Alere, Inc., with its principal place of business in San Diego, California.

19.     The INRatio Products were originally manufactured by HemoSense, Inc. (HemoSense), a Delaware corporation based in San Jose, California.   HemoSense received FDA approval for the INRatio PT/INR Monitors and INRatio PT/INR Test Strips in 2002 and commercial sales began in 2003.  In August of 2007, HemoSense was purchased by Alere, Inc. (then known as Inverness Medical Innovations, Inc.).  In 2008, HemoSense transferred its operations to Alere, Inc.'s facility in San Diego, California.  In 2013, HemoSense's operations were merged into the Alere San Diego corporate entity.

20.     Plaintiffs are informed and believe, and based thereon allege that, at all material times herein, each of the Defendants was the agent, servant, or employee of the other Defendants, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Defendants, and ratified and approved the acts of the other Defendants.

21.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with wrongful acts alleged, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants.

CORRECTED FIRST AMENDED COMPLAINT

# FACTUAL BACKGROUND

### A.    The International Normalized Ratio (INR)

22.    The International Normalized Ratio ("INR") is a standardized metric used to determine the relative speed at which blood clots in a patient's body.  A patient's INR is calculated by comparing a patient's prothrombin time (the speed at which the patient's blood clots) against the normal mean prothrombin time (the average speed for blood-clotting in the general population).   The resulting contrast between a patient's prothrombin time and the normal mean prothrombin time is the patient's INR.[3]

23.    The INR is a measurement for doctors and patients to monitor the blood-clotting speed for patients who have been prescribed anticoagulants ("blood thinners") for certain medical conditions, including but not limited to blood clots, or following the surgical implantation of medical devices, including but not limited to heart valves. Doctors can use the INR measurement to determine whether a patient should increase or decrease his/her dosage of blood thinners.

24.    It is essential for doctors and patients to be able to regularly measure a patient's INR and alter the blood-thinner dosage accordingly due to the serious health risks associated with both high and low blood-clotting times.  High INRs (indicating a relatively slow blood-clotting time) can lead to excessive bleeding,[4] and generally indicates too high a dosage of blood-thinners.  Meanwhile, a low INR (indicating a relatively quick blood-clotting time) can lead to strokes, and generally indicates too *low* a dose of blood-thinners.  In both cases, the consequences of having an irregular INR can lead to serious injury and death.  For these reasons, many patients who take blood thinners constantly monitor their INRs to ensure they are receiving the proper dosage.

---

[3] For example, a patient whose blood-clotting time is double that of the average person's will have an INR of 2.0.

[4] For every increase of just one unit of INR, the estimated risk of bleeding increases between 42% and 44%.

### B.    INRatio "INR Monitoring" System

25.    In the late 1990s, Defendants developed and manufactured the "INRatio monitor," a point-of-care INR monitor that was designed to help patients who have been prescribed blood-thinners, in particular warfarin, to monitor their INRs at home.  Much like those devices used by diabetic patients to monitor their blood-sugar levels, the INRatio monitor worked by having patients insert a blood sample (via an INRatio test strip) into an electronic testing device.  The testing device, after analyzing the blood sample, would then reveal the INR via an electronic display (pictured below):



26.    The "INRatio monitor,' paired with the INRatio test strips, was known as the "INRatio testing kit."

27.    In October of 2002, the FDA approved the INRatio testing kit for home use and commercial sales began in 2003.

28.    Eventually, the INRatio testing kit gave way to the "INRatio2" testing kit. The INRatio2 testing kit operated similarly to its predecessor, pairing an electronic monitor with corresponding test strips.



29.     The INRatio Products are not exclusively prescription devices.  The INRatio Products could be purchased by members of the public  without a prescription.

**C.     Defendants' Knowledge of the INRatio's Defective Qualities**

30.     Almost immediately after Defendants made the INRatio Products available to the public, Defendants began receiving numerous complaints about the INRatio Products' efficacy and accuracy.  In particular, some consumers found that the INR results they were getting when using the INRatio Products differed from the results they obtained when they sent blood from the same samples to independent labs for testing.  The deviations between the INRatio Products' test results and those of independent labs were "clinically significant."  In most cases, the INRatio Products produced INR results that turned out to be incorrectly low, although in numerous other instances, the INRatio produced results that were incorrectly high.

31.    In 2007, a team of doctors in London conducted a study that tested five point-of-care INR testing devices, the INRatio Products among them, for quality and reliability (the "London study").[5]   The doctors took blood samples from patients and determined the patients' INRs using the five point-of-care testing devices.  The doctors then took those same blood samples and sent them to an outside laboratory to obtain secondary INR results.  The study determined that among the five point-of-care devices tested, the INRatio Products performed the worst, with results that deviated most significantly from the results obtained through the outside laboratory.

**D.    Defendants' Unlawful Failure to Properly Report and Respond to Complaints**

32.    Between 2002 and 2014, Defendants received over 18,000 complaints concerning malfunctions with the INRatio Products, no less than 3 of which resulted in deaths.

33.    In May of 2005, following the receipt of numerous complaints concerning Defendants' INRatio systems, the FDA conducted an inspection of Defendants' (then) San Jose operations facility.

34.    Following the inspection, the FDA sent a warning letter ("2005 warning letter," attached as EXHIBIT A) to Defendants, admonishing them for their failure to file MDR

---

[5] Moore GW, Henley A, Cotton SS, Tugnait S, Rangarajan S. Clinically significant differences between point-of-care analysers and a standard analyzer for monitoring the International Normalized Ratio in oral anticoagulant therapy: a multi-instrument evaluation in a hospital outpatient setting.  Blood Coagul Fibrinolysis 2007, 18(3):287-92.

reports.[6]  The letter further labeled the INRatio PT/INR Monitors and INRatio PT/INR Test Strips  as "misbranded" due to "a serious regulatory problem involving INRatio Test Strips and INRatio Test Meters."[7]

35.    The letter stated, "our record indicates your firm had information indicating that INRatio devices were generating clinically significant erroneous values."[8]  More importantly, the letter pointed out that, "[i]f the INR is too low, a patient will be prone to blood clots or strokes.  If the INR is too high, a patient will be prone to excessive bleeding.  Therefore, both high and low test results *have the potential to cause or contribute to a death or serious injury* because they may result in erroneous dosing and thus improper control of [clotting]."[9]

36.    The letter went on to cite specific complaints that had been received by Defendants, wherein the INRatio "provided discrepant results [compared] to lab results" and "[t]his indicates that your device failed to meet its performance specifications or otherwise perform as intended, and therefore malfunctioned."[10]  Further, "[a]ll of these

---

[6] 21 CFR §803.50(a) requires medical device manufacturers to file Medical Device Reporting reports ("MDR reports") to the FDA, within 30 days, after they "receive or become aware of information, from any source, that reasonably suggests that a device [they] market: (1) [m]ay have caused or contributed to a death or serious injury ; or (2) [h]as malfunctioned and this device or a similar device that [they] market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." Additionally, 21 U.S.C. § 360i(a)(1) requires device manufacturers to report to the FDA, in compliance with 21 CFR §803, when the manufacturer receives or otherwise becomes aware of information that reasonably suggests its product either caused a death or serious injury, or malfunctioned in a way such that a similar device would be likely to cause death or serious injury were the malfunction to recur.  Further, under 21 U.S.C. § 352(t)(2), any failure to comply with 21 CFR § 803.50(a) and 21 U.S.C. § 360i (a)(1) will result in the device being deemed "misbranded."

[7] Exhibit A at 1.

[8] *Id.*

[9] *Id.* at 1-2 (emphasis added).

[10] *Id.* at 2.

erroneous readings were clinically significant and were thus likely to lead to incorrect application of [blood-thinner] therapy, with the likely health consequences already noted."[11]

37.     The letter concluded that the Defendants had failed to comply with the Medical Device Reporting regulations because they did not file MDR reports within 30 days of receiving the above-mentioned complaints.[12]  The letter further concluded that Defendants' internal MDR procedure was inconsistent with all the terms of 21 CFR § 803. In particular, Defendants' internal MDR policy only treated complaints as reportable if an investigation determined that "the device *has* caused or contributed to a death or serious injury."[13]  Meanwhile,  21 CFR § 803.50 requires  manufacturers to submit MDRs when a device "*may have* caused or contributed to a death."[14]  In other words, the FDA concluded Defendants' failure to submit MDRs to the FDA was the result of an unlawful systemic policy.

38.     From May 15, 2006 through July 13, 2006, investigators from the FDA conducted another inspection of Defendants' (then) San Jose facility.

39.     On November 29, 2006,  the FDA sent Defendants another warning letter ("2006 warning letter," attached as EXHIBIT B) wherein Defendants were faulted for numerous failures to comply with statutory regulations.

40.     The 2006 warning letter admonished Defendants, *inter alia*, for:  1) failure to investigate complaints involving possible failures of devices to meet any of its specifications; failure to promptly review, evaluate and investigate complaints representing events that are MDR reportable; and 3) failure to file MDRs with the FDA.

---

[11] *Id.* at 2

[12] *Id.* at 1.

[13] *Id.* at 2, citing Defendants' MDR policy (emphasis added).

[14] Emphasis added.

41.     Despite the above admonishments from the FDA, and despite the thousands of complaints received concerning malfunctions that either caused or were likely to have caused serious injuries or death (including 3 malfunctions which did, in fact, result in deaths), Defendants failed to properly submit MDR reports to the FDA, failed to advise consumers of the FDA's admonishments and the defects plaguing the INRatio Products and continued selling the INRatio Products unabated until April, 2014, at all times falsely representing to consumers that the device was an INR monitor, which was safe, accurate, reliable and effective, when such representations were, in fact, false.

42.     If consumers had seen the 2005 or 2006 FDA warning letters, they would have reasonably understood that Defendants resolved the issues addressed in those letters and that INRatio Products were safe and effective.  Reasonable consumers do not expect a company to ignore, disregard, or fail to promptly address concerns raised by the FDA. Moreover, the FDA warning letters made no mention of any specific defects in the INRatio Products.

**E.     Defendants' Misrepresentations and Omissions Regarding the INRatio and INRatio2 Testing Kits**

43.     Defendants misrepresented that the INRatio testing kit was "accurate," "convenient," "effective," "reliable," "optimal" and "safe" in its marketing, advertising and promotional materials.  Defendants made further misrepresentations to consumers and healthcare professionals by naming the monitor the "INRatio Monitor" and placing the words "INRatio Monitor" on the packaging, leading reasonable consumers and healthcare professionals to believe that the product safely, effectively and accurately *monitored* the users' INRs, when in fact they produced false and erroneous results.  Contrary to Defendants' representations, the INR Products were not INRatio Monitors because rather than "monitor" consumers' International Normalized Ratio, the INRatio Products produced erroneous, unreliable results and effectively did not monitor anything.

44.     Defendants made further misrepresentations to consumers and healthcare professionals by omitting material information from the packaging and marketing

materials on the INRatio testing kit, in particular by failing to disclose that the INRatio Products produced false and erroneous results.

45.     Consistent with its predecessor, Defendants misrepresented to consumers and healthcare professionals that the INRatio2 testing kit was "accurate," "convenient," "effective," "reliable," "optimal" and "safe" in its marketing, advertising and promotional materials.

46.     Defendants made further misrepresentations to consumers and healthcare professionals by naming the monitor the "INRatio2 Monitor" and placing the words "INRatio2 Monitor" on the packaging, leading reasonable consumers and healthcare professionals to believe that the products safely, effectively and accurately *monitored* the users' INRs, when in fact rather than monitor consumers' International Normalized Ratio, they produced false and misleading results.

47.     Defendants made further misrepresentations to consumers and healthcare professionals by omitting material information from the packaging and marketing materials of the INRatio Products, in particular, by failing to disclose that the INRatio Products produced false and misleading results.  In fact, the only reason a reasonable consumer would use the INRatio 2 testing kit is to obtain accurate, reliable and safe results.  A testing product which does not provide reliable results is worthless.  Indeed, Defendants' tag line is "Knowing now matters."



CORRECTED FIRST AMENDED COMPLAINT

48.    A true and correct copy of some of Defendants' representations concerning the INRatio2 testing kit is as follows:

# Alere INRatio® 2

The Alere INRatio® 2 PT/INR Monitoring Systems are a handheld blood coagulation system for monitoring patients taking warfarin. Used by healthcare professionals and patients at home, the system consists of a small monitor and disposable test strips. It provides an accurate and convenient measurement of blood clotting time, or PT/INR values. Routine measurements of PT/INR are necessary for the safe and effective management of the patient's warfarin dosing.



**Alere INRatio® 2 PT/INR Monitoring Systems**
The Alere INRatio® 2 PT/INR Monitor connects reliable results with practical convenience, making it an optimal in-office or home testing solution for anticoagulation management.
**Read More >**



**Alere INRatio® 2 PT/INR Monitoring System Test Strips**
The Alere INRatio® 2 PT/INR Monitor connects reliable results with practical convenience, making it an optimal solution for anticoagulation management. **Read More >**

49.    Further, by falsely and misleadingly representing to consumers and healthcare professionals that the INRatio Products were "accurate," "convenient,"

13

"effective," "reliable," "optimal" and "safe" in their marketing, advertising and promotional materials, Defendants made a partial representation while suppressing material facts.  In particular, Defendants suppressed what they had known for years: the INRatio Products produce false and erroneous results.

50.     Further, by falsely and misleadingly representing to healthcare professionals and consumers that the INRatio Products were "accurate," "convenient," "effective," "reliable," "optimal" and "safe" in their marketing, advertising and promotional materials, Defendants actively concealed material information from healthcare professionals and consumers.  In particular, that the INRatio Products produced false and erroneous results.

51.     Defendants further misled consumers and healthcare professionals by withholding information exclusively known to them.  In particular, Defendants knew the INRatio Products contained specific defects, including, but not limited to, defective software and other defects which could be remedied with enhancements to the software. Defendants also knew that these defects were the cause of the INRatio Products' propensity for producing false and erroneous results.

52.     In fact, unbeknownst to consumers and healthcare professionals, Defendants were communicating with the FDA on the very topic of these known defects and conducting undisclosed studies to determine the effectiveness of their software enhancements.  Defendants suppressed and actively concealed the defects, the studies and the communications with the FDA, while simultaneously misrepresenting the INRatio Products to be International Normalized Ratio monitors which were  accurate," "convenient," "effective," "reliable," "optimal" and "safe," when in fact, the INRatio Products were anything but.

53.     Additionally, by falsely and misleadingly representing to consumers and healthcare professionals that the INRatio Products were "accurate," "convenient," "effective," "reliable," "optimal" and "safe" in their marketing, advertising and promotional materials while suppressing and actively concealing material information (including information exclusively known to Defendants), Defendants prevented

14

healthcare professionals and consumers from making informed decisions regarding the use of the INRatio Products.  By preventing healthcare professionals from making informed decisions regarding the use of the INRatio Products, Defendants altered prescribing physicians' decisions concerning their patients' use of the products.

54.    Had Defendants disclosed the above material information (that the INRatio Products contained specific defects that produced false and erroneous results and that Defendants were communicating with the FDA about these defects and attempting to remedy them with software enhancements and studies), healthcare providers would have been made aware of the defects and would not have prescribed the INRatio Products to consumers.  Similarly, consumers would have been made aware of the defects by consulting with their informed healthcare providers and would not have purchased or used the INRatio Products.  Further, had Defendants disclosed that the INRatio Products contained specific defects that produced false and erroneous results, consumers, including those who did not receive prescriptions, would have been made aware of the defects and would not have purchased or used the INRatio Products.

**F.    Defendants' Class 1 Recalls of the INRatio and INRatio2 Testing Kits**

55.    On April 16, 2014, Defendants issued a voluntary recall notice to healthcare professionals for the INRatio2 test strips, citing the disparity between INR results obtained with the INRatio2 system versus significantly higher INR results when re-testing was performed by an independent laboratory.[15]  Defendants' recall notice requested that customers immediately cease using the INRatio2 PT/INR test strips and instead use alternate methods to perform INR testing, including substituting INRatio PT/INR test strips for the defective INRatio2 PT/INR test strips. Notwithstanding the recall, Defendants did not reimburse consumers for the purchase of these dangerous devices, which were worthless.

---

[15] Alere April 16, 2014 Recall Letter, attached as EXHIBIT C.

56.     By singling out the INRatio2 PT/INR test strips in the April 16, 2014 recall notice, Defendants made a partial representation while suppressing material facts.  In particular, the April 16, 2014 recall notice failed to disclose what Defendants had known for years: the defective qualities of the INRatio Products were not limited to the INRatio2 PT/INR test strips.  In fact, at the time the April 16, 2014 recall notice was sent, Defendants knew that the INRatio PT/INR Monitors, the INRatio2 PT/INR Monitors and the INRatio PT/INR test strips produced false and erroneous results.

57.     By directing users to substitute the INRatio PT/INR test strips for the defective INRatio2 PT/INR test strips, Defendants falsely and misleadingly represented to healthcare professionals and consumers that the INRatio PT/INR test strips worked properly, when in fact they caused false and erroneous results.

58.     In the April 16, 2014 recall notice, Defendants also failed to disclose that the INRatio Products contained specific defects (including but not limited to defective software) that produced false and erroneous results and that Defendants were communicating with the FDA about these defects and attempting to remedy them with software enhancements and studies.

59.     Further, by falsely and misleadingly representing to healthcare professionals and consumers that the cause of the INRatio Products' defective qualities was limited to the INRatio2 PT/INR test strips in the April 16, 2014 recall notice, Defendants prevented healthcare professionals and consumers from making informed decisions regarding the use of the INRatio Products.  Additionally, by falsely and misleadingly representing to healthcare professionals and consumers that the cause of the INRatio Products' defective qualities was limited to the INRatio2 PT/INR test strips, Defendants altered prescribing physicians' decisions concerning their patients' use of the products.

60.     Further, by falsely and misleadingly representing to healthcare professionals and consumers that the cause of the INRatio Products' defective qualities was limited to the INRatio2 PT/INR test strips in the April 16, 2014 recall notice, Defendants suppressed and actively concealed material information, known exclusively from healthcare professionals and consumers.

61.     Making matters worse, numerous patients, including those who received prescriptions for the INRatio Products, never received the April 16, 2014 recall notice.

62.     The FDA classified Defendants' April 16, 2014 recall notice as a "Class 1" recall, because it involved the use of products which would cause serious adverse health consequences or death.

63.     On December 5, 2014, Defendants issued a "voluntary" recall letter to customers for the INRatio PT/INR Monitor and INRatio2 PT/INR Monitor, as well as the INRatio PT/INR Test Strips.[16]  The letter stated, "[i]n certain cases an INRatio® PT/INR Testing kit may provide an INR result that is significantly lower than a result obtained using a laboratory INR system."[17]  However, the December 5, 2014 recall notice failed to state that the INRatio Products themselves were defective.  Instead, the notice falsely stated that the false and erroneous results "can arise if [users] have certain medical conditions."[18]  The notice also blames the false and erroneous results on the users' failure to "carefully follow the instructions for performing the test."[19]

64.     Making matters worse, the notice does not instruct all users to cease using the INRatio Products altogether.  Instead, the notice instructed users to contact their doctors to determine if any of the relevant medical conditions apply to them.  The notice also instructed users to take certain precautions to reduce the risk of erroneous results

[16] Alere December 5, 2014 Recall Letter, attached as EXHIBIT D.

[17] *Id.*

[18] *Id.*

[19] *Id.*

1    associated with the alleged failures to carefully follow the instructions.[20]

2         65.    By falsely and misleadingly blaming the erroneous results on "certain

3    medical conditions" and the failure to "carefully follow the instructions" in the December

4    5, 2014 recall notice, Defendants made a partial representation while suppressing material

5    facts.  In particular, the December 5, 2014 recall notice failed to disclose what Defendants

6    had known for years:  the defective qualities of the INRatio Products were not limited to

7    certain medical conditions of users, or failures to carefully follow instructions.  In fact, at

8    the time the December 5, 2014 recall notice was sent, Defendants knew that all of the

9    INRatio Products produced false and erroneous results, irrespective of the medical

10   conditions of the users.

11        66.    In the December 5, 2014 recall notice, Defendants also failed to disclose that

12   the INRatio Products contained specific defects (including, but not limited to, defective

13   software) that produced false and erroneous results and that Defendants were

14   communicating with the FDA about these defects and attempting to remedy them with

15   software enhancements and studies.

16        67.    Further, by falsely and misleadingly representing to healthcare professionals

17   and consumers that the cause of the INRatio Products' defective qualities was limited to

18   "certain medical conditions" and the failure to "carefully follow the instructions" in the

19   December 5, 2014 recall notice, Defendants prevented healthcare professionals and

20   consumers from making informed decisions regarding the use of the INRatio Products.

21   Additionally, by falsely and misleadingly representing to healthcare professionals and

22   consumers that the cause of the INRatio Products' defective qualities was limited to the

23   "certain medical conditions" and the failure to "carefully follow the instructions,"

24   Defendants altered prescribing physicians' decisions concerning their patients' use of the

25   products.

26

27   _____

28   [20] *Id.* at 2-3.

68.     Further, by falsely and misleadingly representing to healthcare professionals and consumers that the cause of the INRatio Products' defective qualities was limited to "certain medical conditions" and the failure to "carefully follow the instructions" in the December 5, 2014 recall notice, Defendants suppressed and actively concealed material information from healthcare professionals and consumers.

69.     Making matters worse, numerous patients, including those who received prescriptions for the INRatio Products, never received the December 5, 2014 recall notice.

70.     The FDA classified Defendants' December 5, 2014 recall notice as a "Class 1" recall, because it involved the use of products which would cause serious adverse health consequences or death.

71.     At long last, on July 11, 2016, following the May 25, 2016 filing of Plaintiffs' original Complaint, Defendants issued a recall notice, withdrawing the INRatio Products from the market.[21]  The recall notice stated that Defendants had spent at least two years developing software enhancements to address the INRatio Products' defective qualities, but the FDA notified Defendants it believed the Defendants' studies did not adequately demonstrate the effectiveness of the software modification.  The recall notice also stated the FDA "advised" (*i.e.*, required)  Defendants to remove the INRatio Products from the market.[22]

72.     Prior to the July 11, 2016 recall notice, Defendants never disclosed to healthcare providers or consumers that the INRatio Products contained specific defects, including but not limited to defective software and other specific defects which could be remedied with enhancements to the software.  Defendants also never previously disclosed that these defects were the cause of the INRatio Products' propensity for producing false and erroneous results or that the Defendants  had been conducting studies to determine the effectiveness of their software enhancements.

---

[21] Alere July 11, 2016 Recall Letter, attached as EXHIBIT E.

[22] *Id.*

73.     The July 11, 2016 recall notice made no mention of "certain medical conditions" or any failure to "carefully follow the instructions."  Instead, Defendants abandoned those false and misleading claims and admitted what they had known since 2005: the INRatio Products simply do not work.

### G.     The ROCKET AF Trial

74.     The damage caused by the INRatio Products' failures,  Defendants' unlawful refusal to acknowledge or address those failures, and Defendants' continued manufacturing,  marketing and selling of a dangerously defective product to unsuspecting consumers, extends beyond the harm suffered by individual users.

75.     In September of 2011, a study was published in the New England Journal of Medicine, later known as the "ROCKET AF trial."[23]  The purpose of the ROCKET AF trial was to compare the most commonly prescribed blood-thinner, warfarin, to a newer drug called rivaroxaban (hereinafter by its trade name, "Xarelto") to determine which drug was more statistically effective in preventing strokes and embolisms.

76.     As part of the methodology, some of the patient-participants were prescribed Xarelto at a fixed dose (the "Xarelto group"), while others were prescribed warfarin at a non-fixed dose (the "warfarin group").  The warfarin group would adjust their dosage based on their INRs, which they were instructed to keep between 2.0 and 3.0.  In other words, the warfarin group would constantly monitor their INRs and take whatever dosage of warfarin was necessary to keep their INRs within the appropriate range.

77.     The study determined Xarelto to be "noninferior" to warfarin and the findings ultimately led to Xarelto's FDA approval.

78.     Following the April 16, 2014 and December 5, 2014 recalls of the INRatio Products, it was revealed that the warfarin group in the ROCKET AF study had used the INRatio Products to monitor their INRs and adjust their dosages accordingly.

---

[23] ROCKET AF being an acronym for "**R**ivaroxaban **O**nce Daily Oral Direct Factor Xa Inhibition **C**ompared with Vitamin **K** Antagonism for Prevention of Stroke and **E**mbolism **T**rial in **A**trial **F**ibrillation."

CORRECTED FIRST AMENDED COMPLAINT

79.     The revelation that the results of the ROCKET AF study were premised, in part, on data collected from individuals using the INRatio Products has called the entire study into question.  A comparison of blood samples from over 5,000 of the ROCKET AF participants revealed that the INR data collected using the INRatio Products differed from the test results obtained from a third-party laboratory.   Johnson & Johnson, makers of Xarelto, turned over the data from the ROCKET AF study to Alere.

80.     According to Sidney Wolfe, M.D., founder of the Public Citizen Health Research Group, and F.R. Rosendaal, M.D., Ph.D., chair of the Department of Clinical Epidemiology at Lieden University Medical Center, Lieden University,  in writing about the ROCKET AF study and the subsequent revelations relating to the INRatio test results, "[n]othing could more adversely impact the validity of monitoring warfarin's blood-thinning effectiveness . . . than false readings -- whether too high or too low -- generated by the testing device used to monitor the degree of blood thinning (the INR)."[24]

## **TOLLING OF THE STATUE OF LIMITATIONS**

81.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, and misleading actions, as alleged herein.  Plaintiffs and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class could not reasonably have discovered the true nature of the Defendants' defective and fraudulently promoted INRatio Products.

82.     Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their INRatio Products.  In particular, Defendants deliberately flaunted the Title 21 regulations requiring them to report the litany of serious

---

[24] Letter from Sidney Wolfe, M.D., founder of the Public Citizen Health Research Group, and F.R. Rosendaal, M.D., Ph.D., chair of the Department of Clinical Epidemiology at Lieden University Medical Center, Liden University, to Stephen Ostroff, M.D., acting commissioner of the FDA, on behalf of Public Citizen Health Research Group, dated December 10, 2015, attached as EXHIBIT F.

CORRECTED FIRST AMENDED COMPLAINT

and life-threatening malfunctions to the FDA.  Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

83.     The causes of action alleged herein did or will only accrue upon discovery of the true nature of the INRatio Products, as a result of Defendants' fraudulent concealment of material facts.  Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful conduct alleged herein.

## PLAINTIFFS' CLAIMS AGAINST DEFENDANTS
### PLAINTIFF DINA ANDREN

*Background*

84.     Plaintiff Dina Andren currently resides in New York City, New York, and is mother to three children.

85.     Plaintiff Andren suffers from a medical condition that requires her to regularly take warfarin (under the trade-name "Coumadin").  As a result, Plaintiff Andren closely monitors her INR.

*Plaintiff Andren's INRatio2 Testing Kit*

86.     Plaintiff Andren purchased an INRatio2 PT/INR testing kit from a pharmacy on April 30, 2015, for $375, and began using the INRatio2 testing kit to monitor her INR.

87.     Plaintiff Andren never received a prescription for the INRatio Products and was not required to show proof of any such prescription when she purchased her INRatio Products.

88.     Plaintiff Andren was required to purchase numerous boxes of replacement INRatio test strips in order to continue with her periodic INR testing.  The boxes, which contained 48 replacement test strips, ranged in price from $240-$285.

89.     When using and purchasing her INRatio Products, Plaintiff Andren relied on Defendants' misrepresentation that one of the products was an "INRatio Monitor," which

caused Plaintiff Andren to believe the INRatio Products would allow her to safely and accurately *monitor* her INR.  Were it not for this misrepresentation, Plaintiff Andren would not have purchased or used the INRatio products.  Further, had Plaintiff Andren known that Defendants were omitting, suppressing and actively concealing material information, in particular that Defendants knew their INRatio Products produced erroneous INR results, Plaintiff Andren would not have purchased or used the INRatio Products.  Further, had Defendants disclosed the above material information, Plaintiff Andren would have been made aware of it and would not have purchased or used the INRatio Products.  Had Defendants disclosed that the INRatio Products contained specific defects which produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them), Plaintiff Andren would have seen and been made aware the INRatio Products produced false and erroneous results and would not have purchased them.

90.     Further, Plaintiff Andren never received or viewed any of the recall notices issued by Defendants.

### Plaintiff Andren's Medical Complications

91.     On the morning of May 24, 2015, Plaintiff Andren tested her INR using her INRatio2 testing kit.  The test results indicated an INR of 2.7.  Relying on her INRatio2 testing kit and believing her INR was above 2.5, Plaintiff Andren did not take Lovenox.

92.     Later that day, Plaintiff Andren was rushed to the hospital where doctors determined she had suffered a stroke.

93.     Following her stroke, Plaintiff Andren continued using her INRatio2 and accompanying test strips to closely monitor her INR and adjust her warfarin dosage accordingly.

94.     In July of 2015, after having carefully monitored and regulated her INR for over a month following her stroke (as indicated by her INRatio2), Plaintiff Andren suffered a Transient Ischemic Attack ("TIA"), otherwise known as a "mini-stroke."

95.     Following her hospitalization for the TIA, Plaintiff Andren returned home

where she continued to use her INRatio2 testing kit to monitor her INR.

96.    In March of 2016, Plaintiff suffered an additional TIA.

97.    While at the hospital, Plaintiff Andren was informed that her INRatio2 testing kit had been the subject of a Class 1 recall.  Prior to this, Plaintiff Andren had been unaware of the recall, or any known problems associated with the INRatio Products.

## PLAINTIFF SIDNEY BLUDMAN

### Background

98.    Plaintiff Sidney Bludman was born in New York City, New York.

99.    For 28 years, Plaintiff Bludman has suffered from a medical condition that requires him to regularly take warfarin (under the trade-name "Coumadin").

100.    For approximately 26 years, Plaintiff Bludman would have his INR tested once a month in a laboratory.  For all 26 years, his INR remained fairly consistent, requiring very infrequent minor adjustments of his warfarin dosage.

### Plaintiff Bludman's INRatio2 Testing kit

101.    Plaintiff Bludman began using an INRatio2 PT/INR testing kit to regularly monitor his INR at home in 2013.

102.    Plaintiff Bludman was required to purchase boxes of replacement INRatio2 test strips in order to continue with his periodic INR testing.  The boxes contained 24 replacement test strips and cost approximately $120.

103.    When using and paying for the INRatio Products, Plaintiff Bludman relied on Defendants' misrepresentation that one of the products was an "INRatio Monitor," which caused Plaintiff Bludman to believe the INRatio Products would allow him to accurately *monitor* his INR.    Were it not for this misrepresentation, Plaintiff Bludman would not have purchased or used the INRatio Products.  Further, had Plaintiff Bludman known that Defendants were omitting, suppressing and actively concealing material information, in particular that Defendants knew their INRatio Products produced erroneous INR results, Plaintiff Bludman would not have purchased or used the INRatio Products.

104.    Further, had Defendants disclosed that the INRatio Products contained

specific defects which produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them), Plaintiff Bludman's prescribing physician would have seen and been made aware the INRatio Products produced false and erroneous results, and would not have prescribed the INRatio Products.  Further, Plaintiff Bludman, through consulting with his physician, would have been made aware that the INRatio Products produce false and erroneous results and he never would have paid for or used the INRatio Products.

### *Plaintiff Bludman's Medical Complications*

105.   In February of 2016, his INR (as indicated by his INRatio testing kit) became exceedingly high.  As a result of the high INR, Plaintiff Bludman reduced his warfarin dosage.

106.   On February 10, 2016, while riding the subway, and after he had lowered his warfarin dosage to offset his supposedly high INR, Plaintiff Bludman suffered a TIA.

107.   Upon returning home from the hospital, Plaintiff Bludman began monitoring his INR with his INRatio2 testing kit and comparing those results with the results of blood tests conducted by a laboratory at his hospital.  He found that his INR, as indicated by his INRatio2 testing kit, was consistently .4-.6 higher than his INR, as indicated by the results of the lab tests.

108.   As a result of his TIA, Plaintiff Bludman is now at a higher risk for future ischemic attacks.

### PLAINTIFF VIRGINIA CIOFFI

### *Background*

109.   Plaintiff Virginia Cioffi currently resides in Vero Beach, Florida.

110.   Plaintiff Cioffi suffers from an Antithrombin III deficiency which can cause blood clots.  As a result, she has been taking warfarin since 2003.

111.   Between January 2004 and February 2013, Plaintiff Cioffi used a Protime home INR monitor and never recorded any irregular results during that time period.

CORRECTED FIRST AMENDED COMPLAINT

*Plaintiff Cioffi's INRatio2 PT/INR Testing Kit*

112.    In February 2013, Plaintiff Cioffi purchased an INRatio2 PT/INR testing kit for approximately $3,300.  She was never prescribed the INRatio Products and was not required to show any proof thereof at the time of purchase.  In the years following the purchase of her INRatio testing kit, Plaintiff Cioffi continued purchasing boxes of replacement test strips, and her own expense.

113.    Plaintiff Cioffi's decision to purchase the INRatio Products was based, in part, on video advertisements she viewed on the Defendants' website in February of 2013. The advertisements represented the products as accurate, convenient, effective, reliable, and safe.  Further, the advertisements conveyed the name "INRatio Monitor," which caused Plaintiff Cioffi to believe the INRatio Products would allow her to accurately *monitor* her INR.

114.    Immediately after Plaintiff Cioffi began using the INRatio Products, her doctor informed her that her INRs were become erratic and irregular.  On several occasions, Plaintiff Cioffi compared the results obtained using the INRatio Products to those obtained at a medical laboratory.  In almost every instance, the results from the INRatio Products differed significantly from those at the laboratory.

115.    When using and purchasing her INRatio Products, Plaintiff Cioffi relied on Defendants' misrepresentation that one of the products was an "INRatio Monitor," which caused Plaintiff Cioffi to believe the INRatio Products would allow her to safely and accurately *monitor* her INR.  Were it not for this misrepresentation, Plaintiff Cioffi would not have purchased or used the INRatio Products.  Further, had Plaintiff Cioffi known that Defendants were omitting, suppressing and actively concealing material information, in particular that Defendants knew their INRatio Products produced erroneous INR results due to defects (including but not limited to defective software and other defects that could be remedied with software enhancements) Plaintiff Cioffi would not have purchased or used the INRatio Products.  Further, had Defendants disclosed the above material information, Plaintiff Cioffi would have seen and been made aware of it and would not

26

have purchased or used the INRatio Products.

116.   Further, Plaintiff Cioffi never received or viewed any of the recall notices issued by Defendants.

## PLAINTIFF BERNARD FALK

### *Background*

117.   Plaintiff Bernard Falk currently resides in Hummelstown, Pennsylvania.

118.   Plaintiff Falk suffers from congestive heart failure, for which he takes warfarin.

### *Plaintiff Falk's INRatio2 PT/INR Testing Kit*

119.   In May of 2012, Plaintiff Falk viewed an advertisement for the INRatio2 PT/INR testing kit in a heart journal.  The advertisement represented the products as accurate, convenient, effective, reliable, and safe.  Further, the advertisements misrepresented one of the products as an "INRatio Monitor," which caused Plaintiff Falk to believe the INRatio Products would allow him to accurately *monitor* his INR.

120.   After viewing the advertisement, Plaintiff Falk contacted his caregiver and received a prescription for the INRatio Products.  He was put in touch with Defendants who sent him an INRatio2 PT/INR testing kit.

121.   For the use of the INRatio2 PT/INR monitor and test strips, Plaintiff Falk pays a monthly co-pay.  To date, he has spent approximately $3,000 for his use of the INRatio Products.

122.   When paying for and using the INRatio Products, Plaintiff Falk relied on Defendants' misrepresentations that the products were accurate, convenient, effective, reliable, optimal and safe, as well as Defendants' misrepresentation that one of the products was an "INRatio Monitor," which caused Plaintiff Falk to believe the INRatio Products would allow him to safely and accurately *monitor* his INR.  Were it not for these misrepresentations, Plaintiff Falk would not have purchased or used the INRatio Products. Further, had Plaintiff Falk known that Defendants were omitting, suppressing and actively concealing material information, in particular that Defendants knew their INRatio

27

Products produced erroneous INR results due to defects (including but not limited to defective software and other defects that could be remedied with software enhancements), Plaintiff Falk would not have purchased or used the INRatio Products.  Further, had Defendants disclosed the above material information, Plaintiff Falk would have seen and been made aware of it and would not have purchased or used the INRatio Products.

123.   Further, had Defendants disclosed that the INRatio Products contained specific defects which produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them with enhancements and studies), Plaintiff Falk's prescribing physician would have been made aware the INRatio Products produced false and erroneous results and would not have prescribed the INRatio Products.  Further, Plaintiff Falk, through consulting with his physician, would have been made aware that the INRatio Products produce false and erroneous results and he never would have paid for or used the INRatio Products.

## PLAINTIFF JEANETTE KERZNER-GREEN

### Background

124.   Plaintiff Jeanette Kerzner-Green currently resides in Savannah, Georgia.

125.   Plaintiff Green suffers from a Protein S deficiency for which she takes Coumadin.

### Plaintiff Green's INRatio2 PT/INR Testing Kit

126.   Between January of 2008 to the present, Plaintiff Green has used an INRatio2 PT/INR testing kit to test her INR.

127.   Plaintiff Green has purchased numerous boxes of INRatio2 PT/INR test strips out of pocket.

128.   When using and purchasing her INRatio Products, Plaintiff Green relied on Defendants' misrepresentation that one of the products was an "INRatio Monitor," which caused Plaintiff Green to believe the INRatio Products would allow her to safely and accurately *monitor* her INR.  Were it not for this misrepresentation, Plaintiff Green would not have purchased or used the INRatio Products.  Further, had Plaintiff Green known that

Defendants were omitting, suppressing and actively concealing material information, in particular that Defendants knew their INRatio Products produced erroneous INR results, Plaintiff Green would not have purchased or used the INRatio Products.  Further, had Defendants disclosed the above material information, Plaintiff Green would have been made aware of it and would not have purchased or used the INRatio Products.

129.   Further, had Defendants disclosed that the INRatio Products contained specific defects which produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them with enhancements and studies), Plaintiff Green's prescribing physician would have been made aware the INRatio Products produced false and erroneous results, and would not have prescribed the INRatio Products.  Further, Plaintiff Green, through consulting with his physician, would have seen and been made aware that the INRatio Products produce false and erroneous results and she never would have paid for or used the INRatio Products.

130.   Further, Plaintiff Green never received or viewed any of the recall notices issued by Defendants.

## PLAINTIFF CAROL MONTALBANO

### Background

131.   Plaintiff Carol Montalbano currently resides in Long Island, New York.

132.   Plaintiff Montalbano suffers from a Protein S deficiency and deep vein thrombosis.

133.   Plaintiff Montalbano has been taking warfarin for 25 years.

### Plaintiff Montalbano INRatio2 PT/INR Testing Kit

134.   Plaintiff Montalbano was prescribed an INRatio2 PT/INR testing kit in September of 2014.

135.   Since September of 2014, Plaintiff Montalbano rented an INRatio2 PT/INR monitor and has purchased numerous boxes of replacement INRatio2 PT/INR test strips, for which she has contributed a copay.

136.   When paying for and using the INRatio Products, Plaintiff Montalbano relied

on Defendants' misrepresentation that one of the products was an "INRatio Monitor," which caused Plaintiff Montalbano to believe the INRatio Products would allow her to accurately *monitor* her INR.  Were it not for this misrepresentation, Plaintiff Montalbano would not have paid for or used the INRatio Products.  Further, had Plaintiff Montalbano known that Defendants were omitting, suppressing and actively concealing material information, in particular that Defendants knew their INRatio Products produced erroneous INR results, Plaintiff Montalbano would not have paid for or used the INRatio Products.

137.   Further, had Defendants disclosed that the INRatio Products contained specific defects which produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them with enhancements and studies), Plaintiff Montalbano's prescribing physician would have seen and been made aware the INRatio Products produced false and erroneous results and would not have prescribed the INRatio Products.  Further, Plaintiff Montalbano, through consulting with her physician, would have been made aware that the INRatio Products produce false and erroneous results and she never would have paid for or used the INRatio Products.

138.   Further, Plaintiff Montalbano never received or viewed the April 16, 2014 or the December 5, 2014 recall notices issued by Defendants.

CORRECTED FIRST AMENDED COMPLAINT

**PLAINTIFF DONALD RIGOT**

*Background*

139.   Plaintiff Donald Rigot currently resides in  Denver, Colorado.

140.   In March of 2012, Plaintiff Rigot suffered a stroke and has taken warfarin ever since.

*Plaintiff Rigot's INRatio2 PT/INR Testing Kit*

141.   In November of 2012, Plaintiff Rigot was prescribed the INRatio2 PT/INR testing kit, which he purchased directly from Defendants for approximately $1,200, out of pocket.  However, at the time of purchase, Plaintiff Rigot was not required to (nor did he) provide proof of the prescription to Defendants.

142.   Since November of 2012, Plaintiff Rigot purchased numerous boxes of replacement INRatio2 PT/INR test strips, for which he paid out of pocket.

143.   Plaintiff Rigot has obtained numerous irregular results since he began using the INRatio2 PT/INR testing kit.  Specifically, Plaintiff Rigot has obtained results which appear uncharacteristically high or uncharacteristically low.  In these instances, Plaintiff Rigot immediately re-tested his INR and obtained entirely different results.

144.   In paying for and using INRatio Products, Plaintiff Rigot relied on Defendants' misrepresentations that one of the products was an "INRatio Monitor," which caused Plaintiff Rigot to believe the INRatio Products would allow him to safely and accurately *monitor* his INR.  Were it not for this misrepresentation, Plaintiff Rigot would not have paid for or used the INRatio Products.  Further, had Plaintiff Rigot known that Defendants were omitting, suppressing and actively concealing material information, in particular that Defendants knew their INRatio Products produced erroneous INR results, Plaintiff Rigot would not have purchased or used the INRatio Products.

145.   Further, had Defendants disclosed that the INRatio Products contained specific defects which produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them through enhancements and studies), Plaintiff Rigot's prescribing physician would have been made

31

aware the INRatio Products produced false and erroneous results, and would not have prescribed the INRatio Products.  Further, Plaintiff Rigot, through consulting with his physician, would have seen and been made aware that the INRatio Products produced false and erroneous results and he never would have paid for or used the INRatio Products.

146.   Plaintiff Rigot never received or viewed the December 5, 2014 recall notice.

## CLASS ACTION ALLEGATIONS

147.   Plaintiffs brings this action, on behalf of themselves, and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

148.   Plaintiffs seek to represent the following  classes defined as (and collectively referred to as "Class"):

### Nationwide Class

All residents of the United States of America who, during the period January 1, 2009 through the present, purchased, rented or otherwise paid for the use of the INRatio Products manufactured, marketed, sold or distributed by Defendants.

### California Sub-Class

All residents of the State of California who, during the period January 1, 2009 through the present, purchased, rented or otherwise paid for the use of the INRatio Products manufactured, marketed, sold or distributed by Defendants.

### Colorado Sub-Class

All residents of the State of Colorado who, during the period January 1, 2009 through the present, purchased, rented or otherwise paid for the use of the INRatio Products manufactured, marketed, sold or

CORRECTED FIRST AMENDED COMPLAINT

distributed by Defendants.

**Florida Sub-Class**

All residents of the State of Florida who,
during the period January 1, 2009 through the present,
purchased, rented or otherwise paid for the use of the
INRatio Products manufactured, marketed, sold or
distributed by Defendants.

**Georgia Sub-Class**

All residents of the State of Georgia who,
during the period January 1, 2009 through the present,
purchased, rented or otherwise paid for the use of the
INRatio Products manufactured, marketed, sold or
distributed by Defendants.

**Maryland Sub-Class**

All residents of the State of Maryland who,
during the period January 1, 2009 through the present,
purchased, rented or otherwise paid for the use of the
INRatio Products manufactured, marketed, sold or
distributed by Defendants.

**New York Sub-Class**

All residents of the State of New York who,
during the period January 1, 2009 through the present,
purchased, rented or otherwise paid for the use of the
INRatio Products manufactured, marketed, sold or
distributed by Defendants.

**Pennsylvania Sub-Class**

All residents of the State of Pennsylvania who,

CORRECTED FIRST AMENDED COMPLAINT

during the period January 1, 2009 through the present, purchased, rented or otherwise paid for the use of the INRatio Products manufactured, marketed, sold or distributed by Defendants.

149.   Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

150.   Plaintiffs reserve the right to establish sub-classes as appropriate.

151.   This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

152.   <u>Numerosity</u>:  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

153.   <u>Ascertainability</u>:  Some names and addresses of members of the Class are available from Defendants' records, and others can be ascertained through appropriate notice.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

CORRECTED FIRST AMENDED COMPLAINT

154.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

155.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

156.   <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

     (a)   The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

     (b)   If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

     (c)   Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

157.   Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

CORRECTED FIRST AMENDED COMPLAINT

158. The common questions of fact include, but are not limited to, the following:

    (a)    Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200, *et seq*.;

    (b)    Whether Defendants engaged in any unfair or deceptive acts or practices in violation of the Consumers Legal Remedies Act sections 1750, *et seq.;*

    (c)    Whether Defendants engaged in any common law fraud;

    (d)    Whether Defendants were unjustly enriched by the above-described acts or practices;

    (e)    Whether Plaintiff and members of the class sustained damages, and if so, the appropriate measure of damages; and

    (f)    Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

159. In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

    (a)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

    (b)    The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

    (c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole and necessitating that any

such relief be extended to members of the Class on a mandatory, class-wide basis.

160.   Plaintiffs are not aware of any difficulty, which will be encountered in the management of this litigation, which should preclude its maintenance as a class action.

## CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS
## FIRST CAUSE OF ACTION
### Violation of the California Consumers Legal Remedies Act
### (Cal. Civil Code §§ 1750, *et seq.*)

161.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

162.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

163.   This cause of action is brought under the California Consumers Legal Remedies Act, California Civil Code sections 1750, *et seq.* (hereinafter, "CLRA"). Plaintiffs and members of the Class are consumers as defined by California Civil Code section 1761(d).  The INRatio Products are goods within the meaning of California Civil Code section 1761(a).

164.   Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by California Civil Code section 1770(a) in transactions with Plaintiff and members of the Class, which were intended to result in, and did result in, the sale of the INRatio Products:

> (1)    Representing that [the INRatio Products] have . . .
> characteristics . . . [and] benefits . . . which they do not have . . .

> (7)    Representing that [the INRatio Products] are of a
> particular . . . quality . . . if they are of another.

> (9)    Advertising goods . . . with intent not to sell them as
> advertised.

165.   Defendants violated the CLRA by misrepresenting,  in advertisements and promotional materials, that the INRatio Products were "accurate," "convenient," "effective," "reliable," "optimal" and "safe," when they were not.

166.   Defendants had direct knowledge that their INRatio Products were producing false and erroneous results and giving consumers false and erroneous information concerning their INRs.

167.    Defendants also knew that false and erroneous INRs would likely lead to consumers improperly adjusting their blood-thinner dosages, significantly increasing the risk and likelihood of serious bodily injury or death.

168.   Defendants also had direct knowledge that the false and erroneous INRs being produced by their INRatio Products had caused, or likely caused, serious injuries and deaths.

169.   Despite the direct knowledge described in paragraphs 162-166, Defendants continued to falsely represent,  in advertisements and promotional materials, that the INRatio Products were "accurate," "convenient," "effective," "reliable," "optimal" and "safe" and continued selling the INRatio Products to unknowing consumers.

170.   Defendants further violated the CLRA by making partial representations while suppressing and actively concealing material facts.  In particular, Defendants improperly named certain INRatio Products "INRatio Monitors" leading healthcare professionals and consumers to reasonably believe the INRatio Products allowed users to safely and reliably *monitor* their INRs.  Additionally, in their recall notices, Defendants falsely represented to consumers that the cause of the defective qualities of the INRatio Products was limited to the INRatio2 PT/INR test strips, as well as "certain medical conditions" and the failure to "carefully follow the instructions."  In doing so, Defendants failed to disclose information exclusively know to them. In particular, Defendants knew the INRatio Products contained specific defects, including but not limited to defective

software and other specific defects, which could be remedied with enhancements to the software. Defendants also knew that these defects were the cause of the INRatio Products' propensity for producing false and erroneous results. In fact, Defendants were communicating with the FDA on the very topic of these known defects and conducting undisclosed studies to determine the effectiveness of their software enhancements. Defendants suppressed and actively concealed the defects, the studies and their communications with the FDA.

171.   Defendants' conduct is malicious, fraudulent, and wanton, and Defendants intentionally mislead and actively concealed material information from consumers in order to increase the sales of the INRatio Products.

172.   By violating the CLRA in the manner described in paragraph nos. 161-171, Defendants prevent healthcare professionals and consumers from making informed decisions regarding the use of the INRatio Products, and alter prescribing physicians' decisions concerning their patients' use of the products. Had prescribing physicians known that the INRatio Products produced false and erroneous results, they would not have prescribed the INRatio Products.

173.   Defendants' misrepresentations and omissions were material to Plaintiffs and members of the Class. Plaintiffs and members of the Class would not have purchased, rented, paid for or used the INRatio Products had it not been for Defendants' misrepresentations and actively concealment and suppression of material facts. Plaintiffs and members of the Class were damaged as a result of Defendants' material misrepresentations and active concealment and suppression of material facts.

174.   Had Defendants disclosed the above material information, that the INRatio Products contained specific defects that produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them), healthcare providers would have been made aware of the defects and would not have prescribed the INRatio Products to consumers. Similarly, consumers

would have been made aware of the defects by consulting with their informed healthcare providers and would not have purchased or used the INRatio Products.  Further, had Defendants disclosed that the INRatio Products contained specific defects that produced false and erroneous results, consumers, acting independently from their healthcare providers, would have been made aware of the defects and would not have purchased or used the INRatio Products.

175.   Pursuant to Section 1782 of the CLRA, on May 25, 2016, Plaintiffs notified Defendants in writing of the particular violations of Section 1770 of the CLRA and demanded that Defendants rectify the problems associated with the behavior detailed above, which acts and practices are in violation of California Civil Code section 1770.

176.   Defendants failed to respond adequately to Plaintiffs' above-described demand within 30 days of Plaintiffs' notice.  Therefore, under California Civil Code section 1782(b), Plaintiffs now request damages and other relief permitted by California Civil Code section 1780 in their prayer for relief.

## SECOND CAUSE OF ACTION
### Violation of Unfair Competition Law
### (California Business & Professions Code §§ 17200, *et seq.*)

177.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

178.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

179.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."  For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200, *et seq*.

180.   Defendants misrepresentations and omissions of material facts, as set forth herein, constitute and unlawful practice because they violate California Civil Code

1  Sections 1572, 1573, 1709, 1710, 1711 and 1770.

2      181.   Defendants' conduct as described herein violates not only the "unlawful"

3  prong of California Business and Professions Code sections 17200, *et seq.*, but also

4  constitutes a violation of the  "unfair" prong.  Defendants' conduct offends public policy

5  and is immoral, unethical, oppressive, unscrupulous and substantially injurious to

6  consumers.  Any justification for Defendants' practices is outweighed by the

7  consequences and harm to Plaintiffs and the Class.

8      182.   There were reasonable alternatives available to Defendants to further

9  Defendants' legitimate business interests, other than the conduct described herein.

10     183.   Defendants' conduct was also "fraudulent, misleading, or likely to deceive

11  the public" within the meaning of California Business and Professions Code

12  section 17200.

13     184.   Defendants' misrepresentations and concealment of material facts were made

14  with the knowledge of their effect, and were done to induce Plaintiff and members of the

15  class to purchase the INRatio Products.  Plaintiffs and members of the Class saw and

16  justifiably relied on Defendants' misrepresentations and concealment of material facts on

17  the marketing and promotional materials, as well as the packaging, when purchasing and

18  using the INRatio Products.

19     185.   Defendants further violate the UCL by making partial representations while

20  suppressing and actively concealing material facts.  In particular, Defendants represented,

21  in advertisements and promotional materials, that the INRatio Products were "accurate,"

22  "convenient," "effective," "reliable," "optimal" and "safe,"  while failing to disclose to

23  consumers that the INRatio Products produced false and erroneous results.  Defendants

24  also improperly named certain INRatio Products "INRatio Monitors," leading healthcare

25  professionals and consumers to reasonably believe the INRatio Products allowed users to

26  safely and reliably *monitor* their INRs. Additionally, in their recall notices, Defendants

27  falsely represented to consumers that the cause of the defective qualities of the INRatio

28  Products was limited to the INRatio2 PT/INR test strips, as well as "certain medical

41
CORRECTED FIRST AMENDED COMPLAINT

conditions" and the failure to "carefully follow the instructions."

186.   Defendants' conduct is malicious, fraudulent, and wanton, and Defendants intentionally mislead and actively concealed material information from consumers in order to increase the sales of the INRatio Products.

187.   By violating the UCL in the manner described in paragraph nos. 177-186, Defendants prevented healthcare professionals and consumers from making informed decisions regarding the use of the INRatio Products, and altered prescribing physicians' decisions concerning their patients' use of the products.  Had prescribing physicians known that the INRatio Products produced false and erroneous results, they would have prescribed the INRatio Products.

188.   Defendants' conduct caused, and continues to cause, financial injury to Plaintiffs and members of the Class in the amounts they paid for the INRatio Products. Defendants' misrepresentations and omissions were material to Plaintiffs and members of the Class.  Plaintiffs and members of the Class would not have purchased and used the INRatio Products had it not been for Defendants' misrepresentations and concealment of material facts.  Nor would Plaintiffs and members of the Class have improperly adjusted their blood-thinner dosages based on the results obtained from the INRatio Products, and in doing so, increased the risk and likelihood of serious injury and death, had it not been for Defendants' misrepresentations and concealment of material facts.  Plaintiffs and members of the Class have suffered injury in fact, and have lost money as a result of Defendants' fraudulent conduct.

189.   Had Defendants disclosed the above material information, that the INRatio Products contained specific defects that produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them), healthcare providers would have been made aware of the defects and would not have prescribed the INRatio Products to consumers.  Similarly, consumers would have been made aware of the defects by consulting with their informed healthcare

providers and would not have purchased or used the INRatio Products.  Further, had Defendants disclosed that the INRatio Products contained specific defects that produced false and erroneous results, consumers, acting independently from their healthcare providers, would have been made aware of the defects and would not have purchased or used the INRatio Products.

190.   Defendants' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and they were material to Plaintiffs and members of the Class.  Reliance upon the misrepresentations and omissions discussed herein may therefore be presumed as a matter of law.  The materiality of such representations and omissions also establishes causation between Defendants' conduct and Plaintiffs' and members of the Class' injuries.

191.   Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief, including restitution to reimburse them for the amounts they paid for the INRatio Products.

192.   Additionally, under Business and Professions Code section 17203, Plaintiffs and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct their actions.

### THIRD CLAIM FOR RELIEF
**Fraud**

193.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

194.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

195.   Defendants knowingly and deliberately falsely marketed the INRatio Products as "accurate," "convenient," "effective," "reliable," "optimal" and "safe" when

they knew the INRatio Products were anything but.  Meanwhile, Defendants  actively concealed and suppressed material facts, namely, that the INRatio Products produced false and erroneous data concerning blood-clotting times, causing consumers to improperly adjust their blood-thinner dosages and increase the risk and likelihood of serious bodily injury and death.

196.   Plaintiffs and members of the Class justifiably relied on the reasonable expectation that Defendants would act in compliance with the law, which included disclosing material facts concerning the false and erroneous data produced by the INRatio Products as well as marketing and promoting the INRatio Products honestly and ethically.

197.   Had the true nature of the Defendants' INRatio Products been disclosed to Plaintiffs and members of the Class, they would not have purchased the INRatio Products, nor would they have relied on them for blood monitoring.

198.   Had Defendants disclosed the above material information, that the INRatio Products contained specific defects that produced false and erroneous results (and that Defendants were communicating with the FDA about these defects and attempting to remedy them through enhancements and studies), healthcare providers would have been made aware of the defects and would not have prescribed the INRatio Products to consumers.  Similarly, consumers would have been made aware of the defects by consulting with their informed healthcare providers and would not have purchased or used the INRatio Products.  Further, had Defendants disclosed that the INRatio Products contained specific defects that produced false and erroneous results, consumers, including those without prescriptions, would have been made aware of the defects and would not have purchased or used the INRatio Products.

199.   Defendants knew their concealment and suppression of materials facts was false, misleading, they were fully aware that their promotional and marketing materials contained false and misleading statements, and they were fully aware that the promotional and marketing materials would be relied upon by consumers when deciding to purchase and use the INRatio Products.

200.   As a result of Defendants' fraudulent omissions and misrepresentations, Plaintiffs and members of the Class have been injured in fact, suffered a loss of money and increased their likelihood of succumbing to serious bodily injury and death.  Plaintiffs and members of the Class would not have purchased the INRatio Products, nor would they have relied on them for blood monitoring, had it not been for Defendants' concealment of material facts and false and misleading statements contained in their promotional materials, marketing materials and packaging.

201.   Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment.  By concealing material information, Defendants intended to induce Plaintiffs and members of the Class into purchasing and using the INRatio Products.

202.   Defendants also made partial representations while suppressing and actively concealing material facts.  Defendants also improperly named certain INRatio Products "INRatio Monitors," leading healthcare professionals and consumers to reasonably believe the INRatio Products allowed users to safely and reliably *monitor* their INRs. Additionally, in their recall notices, Defendants falsely represented to consumers that the cause of the defective qualities of the INRatio Products was limited to the INRatio2 PT/INR test strips, as well as "certain medical conditions" and the failure to "carefully follow the instructions."

203.   Defendants' conduct is malicious, fraudulent, and wanton, and Defendants intentionally mislead and actively concealed material information from consumers in order to increase the sales of the INRatio Products.

204.    As a direct and proximate result of Defendants' misleading statements, omissions and active concealment of material facts, Plaintiffs and each member of the Class has been damaged in an amount according to proof at trial.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

205.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

206.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

207.   By their wrongful acts, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class.

208.    Defendants knowingly, fraudulently, systematically, and uniformly marketed, promoted and sold their defective and dangerous INRatio Products using false and misleading statements while omitting and concealing material facts.

209.   Plaintiffs and members of the Class relied on Defendants' fraudulent, false and misleading statements, in addition to Defendants' omissions and concealment of material fact in order to purchase the INRatio Products.

210.   Thus, Plaintiffs and members of the Class were unjustly deprived.

211.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

212.   Plaintiffs and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

**CLAIMS BROUGHT ON BEHALF OF THE COLORADO SUBCLASS**
**FIFTH CLAIM FOR RELIEF**
**Violation of the Colorado Consumer Protection Act**
**Colo. Rev. Stat. §§ 6-1-101, *et seq.***

213.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

214.   This claim is brought on behalf of Colorado Subclass.

215.   Defendants are "persons" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq*.

216.   Plaintiffs and Colorado Subclass members are "consumers" for purposes of Col. Rev. Stat. § 6-1-113(1)(a) who purchased, rented, paid for or used the INRatio Products.

217.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the INRatio Products that had the capacity or tendency to deceive Colorado Subclass members; (2) representing that the INRatio Products are of a particular standard, quality, and grade even though Defendants knew or should have known they are not; (3) advertising the INRatio Products with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the INRatio Products that was known to Defendants at the time of advertisement, promotions or sale with the intent to induce Colorado Subclass members to purchase, rent, pay for or retain the INRatio Products.

218.   In the course of their business, Defendants failed to disclose and actively concealed the defects in the INRatio Products and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the INRatio Products.

219.   By failing to disclose and by actively concealing the defects in the INRatio Products, by marketing them as safe, reliable, and of high quality, Defendants engaged in unfair or deceptive business practices in violation of the Colorado CPA.

220.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of INRatio Products, the quality of Defendants' brands, and the true value of the INRatio Products.

221.   Defendants intentionally and knowingly misrepresented material facts regarding the INRatio Products with an intent to mislead Plaintiffs and the Colorado Subclass.

222.   Defendants knew or should have known that their conduct violated the Colorado CPA.

223.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the INRatio Products because Defendants:

       a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

       b.   Intentionally concealed the foregoing from Plaintiffs; and/or

       c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

224.   Defendants' failure to disclose and active concealment of the defects and risks posed by the INRatio Products were material to Plaintiffs and the Colorado Subclass.

48

225.   Plaintiffs and the Colorado Subclass suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the defects that existed in the INRatio Products, and Defendants' complete disregard for their well-being, Plaintiffs either would not have paid for or used them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

226.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs individually and on behalf of the Colorado Subclass, seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and each Colorado Subclass member.

227.   Plaintiffs also seek, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## SIXTH CLAIM FOR RELIEF
### Breach of the Implied Warranty of Merchantability
### Colo. Rev. Stat. § 4-2-314

228.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

229.   This claim is brought on behalf of the Colorado Subclass.

230.   Defendants are and were at all relevant times merchants within the meaning of Colo. Rev. Stat. § 4-2-314.

231.   A warranty that the INRatio Products were in merchantable condition was implied by law, pursuant to Colo. Rev. Stat. § 4-2-314.

232.   The INRatio Products, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which INR monitoring kits are used.  Specifically, they are inherently defective and dangerous in that the INRatio Products fail to safely and accurately monitor users' INR.

233.   Defendants were provided notice of these issues by their knowledge of the issues, prior complaints filed against them and/or others, and internal investigations.

234.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff s and the Colorado Subclass have been damaged in an amount to be proven at trial.

**CLAIMS BROUGHT ON BEHALF OF THE FLORIDA SUBCLASS**

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq*.**

235.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

236.   Plaintiffs bring this claim on behalf of the Florida Class.

237.   Plaintiffs are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

238.   Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8). FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

239.   In the course of their business, Defendants failed to disclose and actively concealed that the INRatio Products contained known defects which caused them to produce false and erroneous results.

240.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the INRatio Products.

241.   By suppressing, failing to disclose and by actively concealing the true nature

of the INRatio Products, by marketing them as accurate, safe, reliable, while misrepresenting them as "INRatio Monitors," Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA.

242.   Defendants owed Plaintiffs and the Class a duty to disclose the true nature of the INRatio Products because Defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiffs; and/or (c) made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

243.   Defendants' failure to disclose and active concealment of the nature of the INRatio Products were material to Plaintiffs and the Florida Class.

244.   Plaintiffs and the Florida Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the true nature of the INRatio Products, Plaintiffs and the Class would never have paid for or used them at all. Plaintiffs and the Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

245.   As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and the Florida Class have suffered injury-in-fact and/or actual damage.

246.   Plaintiffs and the Florida Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

247.   Plaintiffs also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

### EIGHTH CLAIM FOR RELIEF
**Breach of Implied Warranty of Merchantability**
**Fla. Stat. §§ 672.314, *et seq*.**

248.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

249.   Plaintiffs bring this claim on behalf of the Florida Class.

250.   A warranty that the INRatio Products were in merchantable condition was implied by law, pursuant to Fla. Stat. § 672.314.

251.   The INRatio Products, when sold and at all times thereafter, were not merchantable or fit for the ordinary purpose for which INR testing kits are used. Specifically, they are inherently defective in that they fail to safely and accurately monitor users' INRs.

252.   Plaintiffs and the Florida Class, at all relevant times, were intended direct and/or third-party beneficiaries of: Defendants' sale of the INRatio Products to Plaintiffs and the Florida Class.

253.   Defendants were provided notice of these issues by their knowledge of the issues, prior complaints filed against them and/or others, and internal investigations.

254.   As a direct and proximate result of Defendants' breach of the warranties of merchantability and fitness for a particular purpose, Plaintiffs and the Florida Class have been damaged in an amount to be proven at trial.

## CLAIMS BROUGHT ON BEHALF OF THE GEORGIA SUBCLASS

### NINTH CLAIM FOR RELIEF
**Violation of the Georgia Fair Business Practices Act**
**Ga. Code Ann. §§ 10-1-390, *et seq*.**

255.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

256.   Plaintiffs bring this claim on behalf of the Georgia Class.

257.   Plaintiffs and the Georgia Class are "consumers" within the meaning of Ga. Code Ann. §§ 10-1-392(6).

258.   Plaintiffs, the Georgia Class, and Defendants are "persons" within the meaning Ga. Code Ann. §§ 10-1-392(24).

259.   Defendants were and are engaged in "trade" and "commerce" within the

meaning of Ga. Code Ann. §§ 10-1-392(28).

260.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

261.   By failing to disclose and actively concealing that the INRatio Products contain known defects that cause them to produce false and erroneous results while misrepresenting them as accurate, safe, reliable, convenient, and effective, and while misrepresenting them, as "INRatio Monitors," Defendants engaged in unfair or deceptive practices prohibited by the FBPA, including: (1) representing that the INRatio Products have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; and (3) advertising them with the intent not to sell or lease them as advertised.

262.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the INRatio Products.

263.   By failing to disclose and by actively concealing the INRatio Products' defects, by marketing them as efficient, safe, reliable, and by presenting themselves as reputable manufacturers, Defendants engaged in unfair or deceptive business practices in violation of the Georgia FBPA.

264.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true nature and reliability of the INRatio Products.

265.   Defendants knew or should have known that their conduct violated the Georgia FBPA.

266.   As alleged above, Defendants made material statements about the nature, safety and reliability of the INRatio Products that were either false or misleading.

267.   Defendants owed Plaintiffs and the Class a duty to disclose the true nature of the INRatio Products because Defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiffs; and/or (c) made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

268.   Defendants' failure to disclose and active concealment of the nature of the INRatio Products emissions were material to Plaintiffs and the Georgia Class.

269.   Plaintiffs and the Georgia Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the true nature of the INRatio Products, Plaintiffs and the Class would never have paid for or used them at all. Plaintiffs and the Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

270.   As a direct and proximate result of Defendants' violations of the Georgia FBPA, Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

271.   Plaintiff and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

272.   Plaintiffs also seek and any just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

**TENTH CLAIM FOR RELIEF**
**Violation of the Georgia Uniform Deceptive Trade Practices Act**
**Ga. Code Ann. §§ 10-1-370,** *et seq***.**

273.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

274.   Plaintiffs bring this claim on behalf of the Georgia Class.

275.   Plaintiffs, the Georgia Class, and Defendants are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

276.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a).

277.   By failing to disclose and actively concealing that the INRatio Products contain known defects that cause them to produce false and erroneous results while misrepresenting them as accurate, safe, reliable, convenient, and effective, and while misrepresenting them, as "INRatio Monitors," Defendants engaged in unfair or deceptive practices prohibited by the UDTPA, including: (1) representing that the INRatio Products have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; and (3) advertising them with the intent not to sell or lease them as advertised.

278.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the INRatio Products.

279.   By failing to disclose and by actively concealing the INRatio Products' defects, by marketing them as efficient, safe, reliable, and by presenting themselves as reputable manufacturers, Defendants engaged in unfair or deceptive business practices in

violation of the Georgia UDTPA.

280.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true nature and reliability of the INRatio Products.

281.   Defendants knew or should have known that their conduct violated the Georgia UDTPA.

282.   As alleged above, Defendants made material statements about the nature, safety and reliability of the INRatio Products that were either false or misleading.

283.   Defendants owed Plaintiffs and the Class a duty to disclose the true nature of the INRatio Products because Defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiffs; and/or (c) made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

284.   Defendants' failure to disclose and active concealment of the nature of the INRatio Products emissions were material to Plaintiffs and the Georgia Class.

285.   Plaintiffs and the Georgia Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the true nature of the INRatio Products, Plaintiffs and the Class would never have paid for or used them at all. Plaintiffs and the Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

286.   As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

287.   Plaintiffs also seek and any just and proper relief available under the Georgia UDTPA per Ga. Code Ann. § 10-1-373.

**CLAIMS BROUGHT ON BEHALF OF THE MARYLAND SUBCLASS**

**ELEVENTH CLAIM FOR RELIEF**
**Violation of the Maryland Consumer Protection Act**
**Md. Code Com. Law §§ 13-101,** *et seq.*

288.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

289.   This claim is brought only on behalf of the Maryland Subclass.

290.   Plaintiffs, the Maryland Subclass, and Defendants are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

291.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  Md. Code Com. Law § 13-303.  Defendants participated in misleading, false, or deceptive acts that violated the Maryland CPA.  By failing to disclose and actively concealing the defects and risks posed by the INRatio Products while advertising, marketing and promoting them as safe, effective, and reliable, and while misrepresenting them as "INRatio Monitors," Defendants engaged in deceptive business practices prohibited by the Maryland CPA.

292.   Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

293.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the INRatio Products and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or use of the INRatio Products.

294.   By failing to disclose and actively concealing the defects and risks posed by the INRatio Products while advertising, marketing and promoting them as safe, effective, and reliable, and while misrepresenting them as "INRatio Monitors," Defendants engaged in unfair or deceptive business practices in violation of the Maryland CPA.  Defendants deliberately withheld the information about the defects, which cause the INRatio Products to produce false and erroneous results, in order to ensure that healthcare providers would prescribe and consumers would pay for the Class INRatio Products.

295.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the defects discussed above. Defendants compounded the deception by repeatedly asserting that the INRatio Products were effective, safe, accurate and  reliable, and by misrepresenting them as "INRatio Monitors."

296.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true nature of the INRatio Products.

297.   Defendants intentionally and knowingly misrepresented material facts regarding the INRatio Products with an intent to mislead Plaintiffs and the Maryland Subclass.

298.   Defendants knew or should have known that their conduct violated the Maryland CPA.

299.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the INRatio Products because Defendants:

      a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

300.   Defendants' failure to disclose and active concealment of the defects in the INRatio Products, which produced false and erroneous results, were material to Plaintiffs and the Maryland Subclass.

301.   Plaintiffs and the Maryland Subclass suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the defects that existed in the INRatio Products, Plaintiffs would never have paid for or used them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

302.   Defendants' violations presented a continuing risk to Plaintiffs, the Maryland Subclass, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

303.   As a direct and proximate result of Defendants' violations of the Maryland CPA, Plaintiffs and the Maryland Subclass have suffered injury-in-fact and/or actual damage.

304.   Pursuant to Md. Code Com. Law § 13-408, Plaintiffs and the Maryland Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**TWELVTH CLAIM FOR RELIEF**
**Breach of the Implied Warranty of Merchantability**
**Md. Code Com. Law § 2-314**

305.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

306.   This claim is brought on behalf of the Maryland Subclass.

CORRECTED FIRST AMENDED COMPLAINT

307.   Defendants are and were at all relevant times merchants with respect to the INRatio Products within the meaning of Md. Code Com. Law § 2-104(1).

308.   A warranty that the INRatio Products were in merchantable condition was implied by law, pursuant to Md. Code Com. Law § 2-314.

309.   The INRatio Products, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which INR testing kits are used. Specifically, they are inherently defective and dangerous in that the INRatio Products fail to safely and accurately monitor users' INRs, and cause users to improperly adjust their blood-thinner dosages.

310.   Defendants were provided notice of these issues by their knowledge of the issues, prior complaints filed against them and/or others, and internal investigations.

311.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff s and the Maryland Subclass have been damaged in an amount to be proven at trial.

## CLAIMS BROUGHT ON BEHALF OF THE NEW YORK SUBCLASS

### THIRTEENTH CLAIM FOR RELIEF
**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law § 349**

312.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

313.   This claim is brought only on behalf of the New York Subclass.

314.   Plaintiffs and New York Subclass are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

315.   Defendants are "persons," "firms," "corporations," or "associations" within the meaning of N.Y. Gen. Bus. Law § 349.

316.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.  Defendants

participated in misleading, false, or deceptive acts that violated the New York GBL.  By
failing to disclose and actively concealing the defects and risks posed by the INRatio
Products while advertising, marketing and promoting them as safe, effective, and reliable,
and while misrepresenting them as "INRatio Monitors," Defendants engaged in deceptive
business practices prohibited by the New York GBL.

317.   Defendants' actions as set forth below and above occurred in the conduct of
trade or commerce.

318.   In the course of their business, Defendants failed to disclose and actively
concealed the dangers and risks posed by the INRatio Products and otherwise engaged in
activities with a tendency or capacity to deceive. Defendants also engaged in unlawful
trade practices by employing deception, deceptive acts or practices, fraud,
misrepresentations, or concealment, suppression or omission of any material fact with
intent that others rely upon such concealment, suppression or omission, in connection
with the sale or use of the INRatio Products.

319.   By failing to disclose and actively concealing the defects and risks posed by
the INRatio Products while advertising, marketing and promoting them as safe, effective,
and reliable, and while misrepresenting them as "INRatio Monitors," Defendants engaged
in unfair or deceptive business practices in violation of the New York GBL.  Defendants
deliberately withheld the information about the defects, which cause the INRatio Products
to produce false and erroneous results, in order to ensure that healthcare providers would
prescribe and consumers would pay for the Class INRatio Products.

320.   In the course of Defendants' business, they willfully failed to disclose and
actively concealed the dangerous risks posed by the defects discussed above. Defendants
compounded the deception by repeatedly asserting that the INRatio Products were
effective, safe, accurate and reliable, and by misrepresenting them as "INRatio Monitors."

321.   Defendants' unfair or deceptive acts or practices, including these
concealments, omissions, and suppressions of material facts, had a tendency or capacity to
mislead, tended to create a false impression in consumers, were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true nature of the INRatio Products.

322.   Defendants intentionally and knowingly misrepresented material facts regarding the INRatio Products with an intent to mislead Plaintiffs and the New York Subclass.

323.   Defendants knew or should have known that their conduct violated the Maryland CPA.

324.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the INRatio Products because Defendants:

  a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

  b.   Intentionally concealed the foregoing from Plaintiffs; and/or

  c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

325.   Defendants' failure to disclose and active concealment of the defects in the INRatio Products, which produced false and erroneous results, were material to Plaintiffs and the New York Subclass.

326.   Plaintiffs and the New York Subclass suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the defects that existed in the INRatio Products, Plaintiffs would never have paid for or used them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

327.   Defendants' violations presented a continuing risk to Plaintiffs, the New York Subclass, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

328.   As a direct and proximate result of Defendants' violations of New York GBL, Plaintiffs and the New York Subclass have suffered injury-in-fact and/or actual damage.

329.   Because Defendants' willful and knowing conduct caused injury to the New York Subclass, the New York Subclass seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**FOURTEENTH CLAIM FOR RELIEF**
**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law § 350**

330.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

331.   Plaintiffs bring this claim on behalf of the New York Class.

332.   Defendants were and are engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

333.   N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made]  with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

334.   Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and the New York Class.

335.   Defendants have violated § 350 because the misrepresentations and omissions regarding the INRatio Products were material and likely to deceive a

reasonable consumer.

336. New York Class members have suffered an injury, including the loss of money, as a result of Defendants' false advertising. In paying for the INRatio Products, New York Plaintiffs and the New York Class relied on the misrepresentations and/or omissions of Defendants with respect to the safety, effectiveness and reliability of the INRatio Products.

337. Defendants' representations were false and/or misleading because the INRatio Products contained defects that produced false and erroneous results. Had Plaintiffs and the New York Class known this, they would never have paid for or used the INRatio Products.

338. Pursuant to N.Y. Gen. Bus. Law § 350 e, the New York Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Class member. Because Defendants' conduct was committed willfully and knowingly, New York members are entitled to recover three times actual damages, up to $10,000, for each New York Class member.

339. The New York Class also seeks attorneys' fees, and any other just and proper relief available under General Business Law § 350.

**CLAIMS BROUGHT ON BEHALF OF THE PENNSYLVANIA SUBCLASS**
**FIFTHTEENTH CLAIM FOR RELIEF**
**Violation of the Unfair Trade Practices and Consumer Protection Law**
**Pa. Stat. Ann. §§ 201-1,** *et seq.*

340. Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

341. This claim is brought only on behalf of the Pennsylvania Subclass.

342. Plaintiffs paid for the INRatio Products pimarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

343.   All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

344.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

345.   Defendants participated in misleading, false, or deceptive acts that violated the Pennsylvania CPL.  By failing to disclose and actively concealing the defects and risks posed by the INRatio Products while advertising, marketing and promoting them as safe, effective, and reliable, and while misrepresenting them as "INRatio Monitors," Defendants engaged in deceptive business practices prohibited by the Pennsylvania CPL.

346.   Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

347.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the INRatio Products and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or use of the INRatio Products.

348.   By failing to disclose and actively concealing the defects and risks posed by the INRatio Products while advertising, marketing and promoting them as safe, effective, and reliable, and while misrepresenting them as "INRatio Monitors," Defendants engaged in unfair or deceptive business practices in violation of the Pennsylvania CPL. Defendants deliberately withheld the information about the defects which cause the

INRatio Products to produce false and erroneous results, in order to ensure that healthcare providers would prescribe and consumers would pay for the Class INRatio Products.

349.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the defects discussed above. Defendants compounded the deception by repeatedly asserting that the INRatio Products were effective, safe, accurate and reliable, and by misrepresenting them as "INRatio Monitors."

350.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true nature of the INRatio Products.

351.  Defendants intentionally and knowingly misrepresented material facts regarding the INRatio Products with an intent to mislead Plaintiffs and the Pennsylvania Subclass.

352.  Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

353.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the INRatio Products because Defendants:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from Plaintiffs; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

354.  Defendants' failure to disclose and active concealment of the defects in the INRatio Products, which produced false and erroneous results, were material to Plaintiffs and the Pennsylvania Subclass.

355.   Plaintiffs and the Pennsylvania Subclass suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the defects that existed in the INRatio Products, Plaintiffs would never have paid for or used them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

356.   Defendants' violations presented a continuing risk to Plaintiffs, the Pennsylvania Subclass, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

357.   As a direct and proximate result of Defendants' violations of Pennsylvania CPL, Plaintiffs and the Pennsylvania Subclass have suffered injury-in-fact and/or actual damage.

358.   Defendants are liable to Plaintiffs and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a).  Plaintiffs and the Pennsylvania Subclass are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

### SIXTHTEENTH CLAIM FOR RELIEF
**Breach of the Implied Warranty of Merchantability**
**13 PA. Stat. Ann. §2314**

359.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

360.   This claim is brought on behalf of the Pennsylvania Subclass.

361.   Defendants are and were at all relevant times merchants with respect to the INRatio Products within the meaning of 13 Pa. Stat. Ann. § 2104.

362.   A warranty that the INRatio Products were in merchantable condition was implied by law in, pursuant to 13 Pa. Stat. Ann. § 2314.

CORRECTED FIRST AMENDED COMPLAINT

363.   The INRatio Products, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for INR testing kits are used. Specifically, they are inherently defective and dangerous in that the INRatio Products fail to safely and accurately monitor users' INRs, and cause users to improperly adjust their blood-thinner dosages.

364.   Defendants were provided notice of these issues by their knowledge of the issues, prior complaints filed against them and/or others, and internal investigations.

365.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff s and the Pennsylvania Subclass have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.   Certifying the Class, as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2.   Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

3.   Awarding Plaintiffs and the members of the Class compensatory damages in an amount according to proof at trial;

4.   Awarding restitution and disgorgement of Defendants' revenues and/or profits to Plaintiffs and members of the Class;

5.   Awarding declaratory and injunctive relief as permitted by law or equity, including: directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

6.   Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

7.   Awarding Plaintiffs and members of the class punitive damages;

8.      Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.      For such other and further relief as the Court deems just and proper.

Dated:  October 3, 2016                          BARON & BUDD, P.C.

                                        By:    /s/ Mark Pifko
                                               Mark Pifko

                                               Roland Tellis (SBN 186269)
                                               rtellis@baronbudd.com
                                               Mark Pifko (SBN 228412)
                                               mpifko@baronbudd.com
                                               Peter Klausner (SBN 271902)
                                               pklausner@baronbudd.com
                                               Baron & Budd, P.C.
                                               15910 Ventura Boulevard, Suite 1600
                                               Encino, California  91436
                                               Telephone:   (818) 839-2333
                                               Facsimile:    (818) 986-9698

                                               Timothy G. Blood (149343)
                                               tblood@bholaw.com
                                               Thomas J. O'Reardon II (247952)
                                               toreardon@bholaw.com
                                               BLOOD HURST & O'REARDON, LLP
                                               701 B Street, Suite 1700
                                               San Diego, California 92101
                                               Telephone:    (619) 338-1100
                                               Facsimile:    (619) 338-1101

                                               Attorneys for Plaintiffs
                                               DINA ANDREN, SIDNEY
                                               BLUDMAN, VIRGINIA CIOFFI,
                                               BERNARD FALK, JEANETTE
                                               KERZNER-GREEN, CAROL
                                               MONTALBANO, and DONALD
                                               RIGOT, individually, and on behalf
                                               of other members of the general
                                               public similarly situated

CORRECTED FIRST AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand a trial of their claims by jury to the extent authorized by law.

3

Dated:  October 3, 2016                          BARON & BUDD, P.C.

4

By:  /s/ Mark Pifko

5

Mark Pifko

6

Roland Tellis (SBN 186269)

7

rtellis@baronbudd.com

Mark Pifko (SBN 228412)

8

mpifko@baronbudd.com

9

Peter Klausner (SBN 271902)

pklausner@baronbudd.com

10

Baron & Budd, P.C.

11

15910 Ventura Boulevard, Suite 1600

Encino, California  91436

12

Telephone:  (818) 839-2333

13

Facsimile:   (818) 986-9698

14

Timothy G. Blood (149343)

15

tblood@bholaw.com

16

Thomas J. O'Reardon II (247952)

toreardon@bholaw.com

17

BLOOD HURST & O'REARDON, LLP

18

701 B Street, Suite 1700

San Diego, California 92101

19

Telephone:   (619) 338-1100

20

Facsimile:    (619) 338-1101

21

Attorneys for Plaintiffs

22

DINA ANDREN, SIDNEY

BLUDMAN, VIRGINIA CIOFFI,

23

BERNARD FALK, JEANETTE

KERZNER-GREEN, CAROL

24

MONTALBANO, and DONALD

25

RIGOT, individually, and on behalf

of other members of the general

26

public similarly situated

27

28

CORRECTED FIRST AMENDED COMPLAINT